## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JUMA JONES,<br>  *Plaintiff*,<br><br>  v.<br><br>SCOTT SANSOM, MACK HAWKINS, and<br>TOWN OF EAST HARTFORD,<br>  *Defendants.* | No. 3:21-cv-442 (VAB) |

### RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Juma Jones ("Mr. Jones") has sued Chief of Police Scott Sansom ("Chief Sansom"), Deputy Chief of Police Mack Hawkins ("Deputy Chief Hawkins"), and the Town of East Hartford (the "Town") (collectively, with Chief Sansom and Deputy Chief Hawkins, "Defendants") for alleged employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.; 42 U.S.C. § 1983; and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 *et seq*. Compl., ECF No. 1 (Mar. 30, 2021) ("Compl.").

Mr. Jones has filed a motion to amend the Complaint to add two claims and four Defendants, Keith Mello ("Chief Mello"), Darryl Hayes ("Chief Hayes"), Connecticut Police Officers Standards and Training Council ("POSTC"), and Connecticut Department of Emergency Services and Public Protection. *See* Mot. to Amend/Correct Compl., ECF No. 43-1 (March 15, 2022) ("Mot. to Amend Compl.").

Additionally, Defendants have filed a motion to amend their Answer to add judicial estoppel as an additional affirmative defense. *See* Defs. Joint Mot. to Amend their Answer to Add an Aff. Defense, ECF No. 64 (June 9, 2022) ("Mot. to Amend Answer").

1

Finally, Mr. Jones moved for summary judgment on all claims, *see* Pl.'s Mot. for Summ. J., ECF No. 68 (June 15, 2022), and Defendants cross-moved for summary judgment on all claims, *see* Defs.' Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J., ECF No. 77 (July 15, 2022).

For the following reasons, Mr. Jones's motion for summary judgment is **DENIED.**

Defendants' motion for summary judgment is **GRANTED in part and DENIED in part.**

Defendants' motion for summary judgment is granted as to the equal protection, due process, and *Monell* claims. Defendants' motion for summary judgment is denied as to the Title VII and CFEPA claims against the Town and the CFEPA aiding and abetting claims against Chief Sansom and Deputy Chief Hawkins.

Mr. Jones's motion to amend the Complaint is **DENIED.**

Defendants' motion for leave to amend their Answer is **DENIED as moot.**

# I.      FACTUAL AND PROCEDURAL BACKGROUND

## A.  Factual Background[1]

### a.  Mr. Jones's Initial Misuse of COLLECT

Mr. Jones is an African American male who is employed by the Town of East Hartford Police Department ("EHPD"). *See* Pl.'s Local Rule 56(a)1 Statement of Facts ¶ 1, ECF No. 68-2

---

[1] The facts are taken from Mr. Jones's Local Rule 56(a)(1) Statement, Defendants' Local Rule 56(a)(1) Statement, and supporting exhibits filed by all parties. *See* D. Conn. L. Civ. R. 56(a)(1) ("Each material fact set forth in the Local Rule 56(a)(1) Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)(2) Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact.").

Local Rule 56(a)(2) requires the party opposing summary judgment to submit a Local Rule 56(a)(2) Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)(1) Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each admission or denial must include a citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)(2), 56(a)(3). Notably, Mr. Jones has submitted a "reply" to Defendants' Rule 56(a)(2) statement. *See* Pl.'s Reply to Defs.' Local Rule 56(a)(2)

("Pl.'s Statement of Facts"); Defs.' Local Rule 56(a)1 Statement of Undisputed Material Facts ¶ 1, ECF No. 77-2 ("Defs.' Statement of Facts"). Mr. Jones was hired as a police officer in 2003 and is now serving as a Police Service Aide. *See* Pl.'s Statement of Facts ¶¶ 1, 31; Defs.' Statement of Facts ¶¶ 1–2.

Mr. Jones is a member of the East Hartford Police Officers' Association (the "Union") and subject to a collective bargaining agreement. *See* Defs.' Statement of Facts ¶ 3; Pl.'s L.R. 56(a)(2) Statement of Facts in Opp'n to Defs.' Mot. for Summ. J. ¶ 3, ECF No. 81 ("Pl.'s Resp. to Defs.' Statement of Facts").

On January 11, 2013, Mr. Jones was arrested at his former girlfriend's residence. *See* Defs.' Statement of Facts ¶ 5; Pl.'s Resp. to Defs.' Statement of Facts ¶ 5. Mr. Jones was questioned and charged with Breach of Peace and Criminal Trespass. Defs.' Statement of Facts ¶ 6.[2] The parties dispute whether Mr. Jones found his former girlfriend's address using the

---

Statement, ECF No. 81. The Local Rules do not provide for replies to the 56(a)(2) Statements and, therefore, the Court does not consider Mr. Jones's reply to Defendants' Rule 56(a)(2) Statement. *See* D. Conn. L. Civ. R. 56.

[2] Mr. Jones objects to this paragraph of Defendants' Statement of Facts, arguing that Exhibit A, an internal investigation report that provides the basis for the statement, is inadmissible hearsay. *See* Pl.'s Resp. to Defs.' Statement of Facts ¶ 6. Mr. Jones makes a similar objection about Exhibit B, which is a second internal investigation report that provides the basis for other statements in Defs.' Statement of Facts. *See* Pl.'s Resp. to Defs.' Statement of Facts ¶ 7.

"Under Fed. R. Civ. P. 56(e), only admissible evidence may be used to resist a motion for summary judgment . . . ." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 218 n.6 (2d Cir. 2000); *see also Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017) ("[M]aterial relied on at summary judgment need not be admissible in the form presented to the district court . . . so long as the evidence in question 'will be presented in admissible form at trial,' it may be considered on summary judgment."). In light of Chief Sansom's declaration, *see* Ex. 1 to Defs.' Reply in Supp. of Summ. J. at ¶¶ 3–4, 7–8, 11, ECF No. 82-1, both internal affairs reports are likely admissible as an exception to hearsay under Federal Rule of Evidence 803(6). *See* Fed. R. Evid. 803(6); *see also Smith*, 697 F. App'x at 89 (finding that documents "could readily be reduced to admissible form at trial" under the business record exception and therefore were properly considered at summary judgment). The statements within the internal affairs reports from parties that have not been deposed and that were not otherwise made under penalty of perjury are likely inadmissible hearsay, unless Defendants can show that the statements are not offered for their truth or that the statements can be produced in an admissible form, such as direct testimony. *See Smith*, 697 F. App'x at 89. Mr. Jones's statements within the internal affairs reports, however, are likely admissible as opposing party statements under Federal Rule of Evidence 801(d)(2)(A). *See Worley v. City of New York*, No. 17 Civ. 4337 (LGS), 2020 WL 730326, at *7 n.2 (S.D.N.Y. Feb. 12, 2020) (finding plaintiffs' statements admissible against him under 801(d)(2)(A) "assuming that [p]laintiffs are available to testify at trial"). Therefore, the Court relies only on the statements within the internal affairs report that it can determine at this stage would likely be admissible at trial.

Connecticut On-Line Law Enforcement Communications Teleprocessing System

("COLLECT").[3]

EHPD initiated an internal investigation ("IA 13-03"), and Mr. Jones was placed on

administrative leave. *See* Defs.' Statement of Facts ¶ 9; Pl.'s Resp. to Defs.' Statement of Facts ¶

9. On February 4, 2013, an arrest warrant was issued for Mr. Jones on three counts of Computer

Crime in the Third Degree in violation of Connecticut General Statute § 53a-254. *See* Defs.'

Statement of Facts ¶ 12; Pl.'s Resp. to Defs.' Statement of Facts ¶ 12.

As a result of new information identified during the criminal investigation, EHPD

initiated a second internal investigation ("IA 13-04"). *See* Defs.' Statement of Facts ¶ 14; Pl.'s

Resp. to Defs.' Statement of Facts ¶ 14. There was also a second criminal investigation based on

this new information. *See* Defs.' Statement of Facts ¶ 14; Pl.'s Resp. to Defs.' Statement of Facts

¶ 14.

IA 13-03 concluded that Mr. Jones "[k]nowingly access[ed] the COLLECT system to

obtain information for personal reasons and/or curiosity," and "[k]nowingly enter[ed] false,

improper and inaccurate information into the COLLECT system." *See* Defs.' Statement of Facts

¶ 13. Thereafter, on February 22, 2013, EHPD terminated Mr. Jones. *See id.*; Pl.'s Statement of

Facts ¶ 2.

On July 3, 2013, a warrant was issued for Mr. Jones's arrest related to 18 additional

charges under Connecticut General Statutes § 53a-254. *See* Defs.' Statement of Facts ¶ 16; Pl.'s

Resp. to Defs.' Statement of Facts ¶ 16.

---

[3] Defendants rely on the internal investigations, which include quoted statements from Mr. Jones to the arresting officer on January 11, 2013, to support the proffered fact that Mr. Jones admitted to using the COLLECT system to find his former girlfriend's address. *See* Defs.' Statement of Facts ¶ 8. Mr. Jones, however, relying on statements he has made regularly since his initial arrest, contends that he did not use COLLECT to look up his former girlfriend's address, but that he instead only used COLLECT to find out if his former girlfriend had any outstanding warrants. *See* Pl.'s Statement of Facts ¶ 56.

On December 13, 2013, IA 13-04 was paused. *See* Defs.' Statement of Facts ¶ 17; Pl.'s Resp. to Defs.' Statement of Facts ¶ 17; *see also* Ex. F to Defs.' Mot. for Summ. J. at 1, ECF No. 77-9 ("Initial IA 13-04").

On February 14, 2014, Mr. Jones appeared at a hearing before the Honorable James Bentivegna concerning his application for accelerated rehabilitation related to his criminal charges for misusing COLLECT. *See* Defs.' Statement of Facts ¶ 18; Pl.'s Resp. to Defs.' Statement of Facts ¶ 18. Mr. Jones's application for accelerated rehabilitation was ultimately granted. *See* Defs.' Statement of Facts ¶ 22; Pl.'s Resp. to Defs.' Statement of Facts ¶ 22.

**b. Legal Challenges to Mr. Jones's Termination**

With the support of the Union, Mr. Jones grieved his termination to the State of Connecticut Board of Mediation and Arbitration ("SBMA"). *See* Defs.' Statement of Facts ¶ 23; Pl.'s Resp. to Defs.' Statement of Facts ¶ 23.

On November 10, 2014, after conducting hearings, the SBMA stated that "the evidence is sufficient to establish [Mr.] Jones did violate the rules regarding the COLLECT system insofar as he did not have a valid law enforcement purpose for making the various inquiries" and his COLLECT entries "w[ere] not accurate and constituted a violation of a police department rule against entering inaccurate information in department records." *See* Defs.' Statement of Facts ¶¶ 24–26; Pl.'s Resp. to Defs.' Statement of Facts ¶¶ 24–26. The SBMA, however, ultimately found that EHPD did not have just cause to terminate Mr. Jones and that the appropriate penalty, based in part on comparing Mr. Jones's conduct to two white female dispatchers who were suspended for similar conduct, should be an approximately 20-month suspension without pay. *See* Pl.'s Statement of Facts ¶ 4; Defs.' Rule 56(a)(2) Statement of Facts ¶ 4, ECF No. 77-3 ("Defs.' Resp. to Pl.'s Statement of Facts").

5

When the SBMA decision was issued, Chief Sansom had taken over as Chief of EHPD. *See* Defs.' Statement of Facts ¶ 34; Pl.'s Resp. to Defs.' Statement of Facts ¶ 34. Chief Sansom decided to appeal the SBMA decision to the Connecticut Superior Court, after consulting with EHPD's human resources department and legal counsel. *See* Defs.' Statement of Facts ¶ 38; Pl.'s Statement of Facts ¶¶ 5–6.

Additionally, in the wake of the SBMA decision, Chief Sansom ordered that IA 13-04, which EHPD had not been investigating since Mr. Jones was terminated in 2013, be "completed." *See* Defs.' Statement of Facts ¶ 42; Pl.'s Resp. to Defs.' Statement of Facts ¶ 42.[4] On December 4, 2014, EHPD advised Mr. Jones by letter that IA 13-04 had been re-opened and requested Mr. Jones to appear for a *Garrity* interview. *See* Defs.' Statement of Facts ¶ 43; Pl.'s Resp. to Defs.' Statement of Facts ¶ 43. Mr. Jones did not participate in a *Garrity* interview. *See* Defs.' Statement of Facts ¶ 43; Pl.'s Resp. to Defs.' Statement of Facts ¶ 43.

IA 13-04 concluded that Mr. Jones's misuse of the COLLECT system violated EHPD Department Rules and Regulations. *See* Defs.' Statement of Facts ¶ 44; Pl.'s Resp. to Defs.' Statement of Facts ¶ 44.

On February 5, 2015, Chief Sansom terminated Mr. Jones a second time. *See* Defs.' Statement of Facts ¶ 46; Pl.'s Statement of Facts ¶ 7. In response, the Union filed a grievance with the State Board of Labor Relations (the "Labor Board") on behalf of Mr. Jones, arguing the Town did not comply with the SBMA decision when it terminated Mr. Jones a second time. *See* Defs.' Statement of Facts ¶ 51; Pl.'s Resp. to Defs.' Statement of Facts ¶ 51.

---

[4] The parties dispute whether IA 13-04 was closed in 2013 and then "re-opened" in 2014, after Mr. Jones's reinstatement, or if IA 13-04 was simply paused and then resumed in 2014. This distinction, however, is not material because the parties appear to at least agree that between December 2013 and November 2014, no one at EHPD was working on or intended to complete IA 13-04.

On March 2, 2016, the Connecticut Superior Court affirmed the SBMA decision. *See* Pl.'s Statement of Facts ¶ 9; Defs.' Statement of Facts ¶ 39. On March 21, 2016, the Town appealed to the Connecticut Appellate Court. *See* Pl.'s Statement of Facts ¶ 10; Defs.' Statement of Facts ¶ 41.

On July 14, 2016, the Labor Board found in favor of the Union and Mr. Jones, and ordered the Town to rescind the second termination and to "cease and desist" from refusing to comply with the SBMA decision. *See* Defs.' Statement of Facts ¶ 52; Pl.'s Resp. to Defs.' Statement of Facts ¶ 52; Pl.'s Statement of Facts ¶ 8. The Labor Board decision was explicitly subject to the outcome of the Town's pending appeal of the SBMA decision. *See* Defs.' Statement of Facts ¶ 53; Pl.'s Resp. to Defs.' Statement of Facts ¶ 53.

On July 16, 2013, after his first termination, Mr. Jones and two other EHPD officers filed a discrimination lawsuit against the Town in the District of Connecticut. *See* Defs.' Statement of Facts ¶ 47; Pl.'s Resp. to Defs.' Statement of Facts ¶ 47. On March 31, 2016, Judge Eginton granted the defendants' motion for summary judgment in that case. *See* Defs.' Statement of Facts ¶ 50; Pl.'s Resp. to Defs.' Statement of Facts ¶ 50.

### c. The Memorandum of Agreement

In mid-October 2016, Mr. Jones, the Union, and the Town entered into a memorandum of agreement ("MOA") settling all parties' pending claims related to Mr. Jones's employment. *See* Pl.'s Statement of Facts ¶ 11; Defs.' Statement of Facts ¶ 55.[5]

In accordance with the MOA, the Town withdrew its appeal of the SBMA decision and agreed to reinstate Mr. Jones. *See* Defs.' Statement of Facts ¶ 57; Pl.'s Statement of Facts ¶ 11.

---

[5] The parties' dispute whether Mr. Jones knowingly and voluntarily signed the MOA. *See* Pl.'s Resp. to Defs.' Statement of Facts ¶ 56. Mr. Jones contends that he only signed the MOA because the Union informed him that they would no longer represent him in future appeal proceedings. *See* Pl.'s Statement of Facts ¶ 12.

The Town also agreed to "take all steps necessary to assist [Mr. Jones] in his efforts to receive recertification to access and use the . . . COLLECT System." Defs.' Statement of Facts ¶ 57; Pl.'s Resp. to Defs.' Statement of Facts ¶ 57. The MOA included a similar provision requiring the Town to "take all steps necessary" to help Mr. Jones get recertified with POSTC. *See* Pl.'s Statement of Facts ¶ 14.

To be a police officer in Connecticut, Mr. Jones must be certified by POSTC. If Mr. Jones was not recertified by POSTC and/or COLLECT, the MOA provided that the Town would allow Mr. Jones to "remain a member of the Union and . . . receive compensation equivalent to a sworn officer with [Mr. Jones's] seniority" and perform "tasks and responsibilities" that the Chief determined were "in the best interests of the Department that [did] not require [Mr. Jones] to be a fully sworn officer." Defs.' Statement of Facts ¶ 58; Pl.'s Resp. to Defs.' Statement of Facts ¶ 58.

### d.  Efforts to Recertify Mr. Jones with POSTC and COLLECT

On September 1, 2016, EHPD Deputy Chief Davis sent an e-mail to Mr. Tanner, a POSTC certification officer, asking that POSTC consider recertifying Mr. Jones. *See* Defs.' Statement of Facts ¶ 59; Pl.'s Resp. to Defs.' Statement of Facts ¶¶ 59, 65.

On November 17, 2016, POSTC held a hearing and considered whether to recertify Mr. Jones. *See* Pl.'s Statement of Facts ¶ 15; Defs.' Statement of Facts ¶ 60. Deputy Chief Davis, Deputy Chief Hawkins, and the Town's attorney, Meredith Diette ("Attorney Diette"), attended the hearing with Mr. Jones, but Chief Sansom did not attend. *See* Pl.'s Statement of Facts ¶ 23; Defs.' Resp. to Pl.'s Statement of Facts ¶ 23. Mr. Jones was not prepared to testify at the hearing and did not testify at the hearing. *See* Pl.'s Statement of Facts ¶ 26; Defs.' Resp. to Pl.'s Statement of Facts ¶ 26.

During the hearing, John Daly ("Chief Daly"), the Chief of Southington Police Department and member of POSTC, suggested that, in addition to the 13 preexisting POSTC certification training requirements, Mr. Jones should also be required to be COLLECT certified before POSTC would recertify him as a police officer. *See* Pl.'s Resp. to Defs.' Statement of Facts ¶¶ 60–61; Defs.' Statement of Facts ¶ 61.

At the November 17, 2016 hearing, POSTC granted EHPD's request to recertify Mr. Jones if Mr. Jones completed the 13 typical requirements and was also recertified by COLLECT. *See* Defs.' Statement of Facts ¶ 61; Pl.'s Resp. to Defs.' Statement of Facts ¶ 61.

On November 21, 2016, EHPD officially reinstated Mr. Jones. *See* Defs.' Statement of Facts ¶ 62; Pl.'s Resp. to Defs.' Statement of Facts ¶ 62.

On November 23, 2016, Chief Sansom requested that COLLECT retrain and recertify Mr. Jones. *See* Defs.' Statement of Facts ¶ 63; Pl.'s Resp. to Defs.' Statement of Facts ¶ 63. As part of this request, Chief Sansom informed COLLECT that EHPD would monitor Mr. Jones's COLLECT use and provided copies of the two EHPD internal investigations. *See* Defs.' Statement of Facts ¶ 64; Pl.'s Resp. to Defs.' Statement of Facts ¶ 64.

On January 31, 2017, Connecticut State Police Lieutenant Scott Smith ("Lieutenant Smith") informed Mr. Jones that COLLECT would not recertify him "due to multiple violations of the [Criminal Justice Information System] Security Policy, where [he] misused the COLLECT system for non-law enforcement purposes to secure personal information for [his] own benefit." *See* Defs.' Statement of Facts ¶ 70; Pl.'s Resp. to Defs.' Statement of Facts ¶ 70.

Lieutenant Smith scheduled a hearing for March 2, 2017, so that Mr. Jones could be heard regarding the COLLECT certification denial. *See* Defs.' Statement of Facts ¶ 72; Pl.'s Resp. to Defs.' Statement of Facts ¶ 72.

On March 2, 2017, Mr. Jones attended the COLLECT hearing with Deputy Chief Hawkins, Deputy Chief Davis, and Attorney Diette; Chief Sansom did not attend. *See* Defs.' Statement of Facts ¶¶ 75–76; Pl.'s Resp. to Defs.' Statement of Facts ¶¶ 75–76; Pl's Statement of Facts ¶¶ 22–23; Defs.' Resp. to Pl.'s Statement of Facst ¶¶ 22–23. The hearing was conducted by Chief Daryl Hayes ("Chief Hayes"), who was the Criminal Justice Information System Officer for the Connecticut State Police at the time. *See* Defs.' Statement of Facts ¶ 73; Pl.'s Resp. to Defs.' Statement of Facts ¶ 73. Mr. Jones did not testify at the hearing. *See* Pl.'s Statement of Facts ¶ 26; Defs.' Resp. to Pl.'s Statement of Facts ¶ 26.

On June 1, 2017, Chief Hayes, relying on the two EHPD internal investigations, the accelerated rehabilitation transcript, and the various legal proceedings, affirmed the decision to not recertify Mr. Jones to use COLLECT. *See* Defs.' Statement of Facts ¶¶ 77–78; Pl.'s Resp. to Defs.' Statement of Facts ¶¶ 77–78; Pl.'s Statement of Facts ¶ 28; Defs.' Resp. to Pl.'s Statement of Facts ¶ 28.

On June 13, 2017, Deputy Chief Davis sent an e-mail to Mr. Jones, informing him that he could appeal the COLLECT decision. *See* Defs.' Statement of Facts ¶ 80.[6] The Town did not file an appeal on Mr. Jones's behalf and therefore, on July 10, 2017, Mr. Jones personally filed an appeal. *See* Defs.' Statement of Facts ¶ 81; Pl.'s Statement of Facts ¶ 29; Defs.' Resp. to Pl.'s Statement of Facts ¶ 92.

On March 1, 2018, the Connecticut Superior Court dismissed Mr. Jones's appeal of the COLLECT denial because it found that Chief Hayes's decision was not final agency action. *See*

---

[6] Mr. Jones contests that he was given notice of his right to appeal with enough time to file the appeal. *See* Pl.'s Resp. to Defs.' Statement of Facts ¶ 80. In his deposition, Deputy Chief Davis stated that he did not know the statute cited in the e-mail for the appeal deadline and could not be sure if the e-mail was ever received because he did not receive a response from Mr. Jones. *See* Attach. 9 to Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 105–07, ECF No. 80-9 ("Davis Dep.").

Defs.' Statement of Facts ¶ 84; Pl.'s Resp. to Defs.' Statement of Facts ¶ 84; *see also Jones v. State*, No. CV176038627, 2018 WL 1659438 (Conn. Super. Ct. Mar. 1, 2018).

On June 27, 2017, Chief Sansom requested that POSTC reconsider its position regarding Mr. Jones's recertification. *See* Defs.' Statement of Facts ¶ 85; Pl.'s Resp. to Defs.' Statement of Facts ¶ 85. On August 17, 2017, POSTC Chairman Chief Mello informed Mr. Jones that POSTC would not reconsider his recertification because he "has not completed COLLECT training and certification . . . and at this point [POSTC] has no reason to entertain the same request again." *See* Defs.' Statement of Facts ¶ 86; Pl.'s Resp. to Defs.' Statement of Facts ¶ 86.

In December 2019, Mr. Jones asked Chief Sansom to send a pre-drafted letter to Chief Hayes regarding Mr. Jones's COLLECT recertification. *See* Pl.'s Statement of Facts ¶ 34; Def.'s Resp. to Pl.'s Statement of Facts ¶ 34. In January 2020, Chief Sansom declined to send the letter to Chief Hayes. *See* Pl.'s Statement of Facts ¶ 35; Defs.' Resp. to Pl.'s Statement of Facts ¶ 35.

### e. The Police Service Aid Position

Mr. Jones satisfied all 13 of POSTC's certification requirements, but, because he was not recertified by COLLECT, he was not recertified by POSTC and could not be reinstated as an EHPD Police Officer. *See* Defs.' Statement of Facts ¶ 79; Pl.'s Resp. to Defs.' Statement of Facts ¶ 79.

Therefore, the Town created a civilian "non-certified" position for Mr. Jones, as required by the MOA. *See* Pl.'s Statement of Facts ¶ 31; Defs.' Statement of Facts ¶ 90.

In August 2017, Deputy Chief Hawkins and Deputy Chief Davis informed Mr. Jones of this new position, which was called "Police Service Aid." *See* Pl.'s Statement of Facts ¶ 31; Defs.' Resp. to Pl.'s Statement of Facts ¶ 31. The Police Service Aid works under the Deputy Chief of Operations, which, at the time, was Deputy Chief Hawkins, and reports daily to the

Watch Commander. *See* Defs.' Statement of Facts ¶¶ 91–92; Pl.'s Resp. to Defs.' Statement of Facts ¶¶ 91–92.

According to the guide created for the position, Mr. Jones was required to "assist in the safety and security of the public safety complex (PSC): including headquarters safety and security[,] assist in maintaining order in the PSC lobby[,] . . . monitor[] and control[] access to the secure portions of the PSC." *See* Pl.'s Statement of Facts ¶ 33; Defs.' Resp. to Pl.'s Statement of Facts ¶ 33.

Mr. Jones did not have a police officer badge or gun. *See* Pl.'s Statement of Facts ¶ 38; Defs.' Resp. to Pl.'s Statement of Facts ¶ 38. Mr. Jones was required to wear a different uniform, which was gray instead of the traditional blue and made Mr. Jones feel like he was being alienated. *See* Pl.'s Statement of Facts ¶¶ 43, 46; Defs.' Resp. to Pl.'s Statement of Facts ¶¶ 43, 46. Mr. Jones reported that he felt unsafe in his new position. *See* Pl.'s Statement of Facts ¶ 44; Defs.' Resp. to Pl.'s Statement of Facts ¶ 44.

In 2020, while working as a Police Service Aide, Mr. Jones had to approach a man with a handgun and take that handgun from him. *See* Pl.'s Statement of Facts ¶ 51; Defs.' Resp. to Pl.'s Statement of Facts ¶ 51.

The remaining facts concerning Mr. Jones's experience as a Police Service Aide are contested. *See generally* Pl.'s Resp. to Defs.' Statement of Facts ¶¶ 98–107; Defs.' Resp. to Pl.'s Statement of Facts ¶¶ 43–52.

### f.   Mr. Jones's Evidence of Alleged Racial Discrimination at EHPD

Mr. Jones has provided evidence which he argues shows there is a racially hostile work environment at EHPD.

First, Lieutenant Stoldt referred to Officer Mark Allen as "boy," made insensitive comments to a group of Jamaican officers, and posted "pictures of Black people . . . all over his office." *See* Pl.'s Statement of Facts ¶ 56; Defs.' Resp. to Pl.'s Statement of Facts ¶ 56. Lieutenant Stoldt retired in 2014 in good standing, despite having violated EHPD Department policy by visiting a woman while on duty. *See* Pl.'s Statement of Facts ¶ 57; Defs.' Resp. to Pl.'s Statement of Facts ¶ 57.

Second, EHPD Dispatcher Diane Cycena ("Dispatcher Cycena"), who is a Caucasian woman, improperly used COLLECT and was suspended for one week. *See* Pl.'s Statement of Facts ¶ 58; Defs.' Resp. to Pl.'s Statement of Facts ¶ 58. Similarly, EHPD Dispatcher Kelly McElroy ("Dispatcher McElroy"), also a Caucasian woman, violated COLLECT rules when she allowed another person to access her account to make an inquiry and was suspended for one week. *See* Pl.'s Statement of Facts ¶ 59; Defs.' Resp. to Defs.' Statement of Facts ¶ 59.

Third, Mr. Jones produced a chart that shows the disciplinary decisions Chief Sansom made between 2014 and 2020, which includes the alleged violation and the race of the employee for each disciplinary decision. *See* Ex. 4 to Pl.'s Opp'n to Defs.' Mot. for Summ. J., ECF No 80-6.

Fourth, in November 2020, an anonymous e-mail was sent to EHPD staff from a private e-mail address that addressed racial issues in the department. *See* Pl.'s Statement of Facts ¶ 64; Defs.' Resp. to Pl.'s Statement of Facts ¶ 64. Chief Sansom and Deputy Chief Hawkins were not included as e-mail recipients, and they did not investigate the e-mail. *See* Pl.'s Statement of Facts ¶ 64; Defs.' Resp. to Pl.'s Statement of Facts ¶ 64.

Fifth, Chief Sansom overturned a two-week suspension of a white male officer who had allegedly used excessive force against a twelve-year-old Hispanic male. *See* Pl.'s Resp. to Defs.' Statement of Facts at 29 ¶ 1.

### B. Procedural History

On March 30, 2021, Mr. Jones filed a Complaint stating nine causes of action: (1) racial discrimination and creation of a hostile work environment in violation of Title VII as to East Hartford ("Count One"); (2) retaliation in violation of Title VII as to East Hartford ("Count Two"); (3) discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment ("Count Three"); (4) denial of due process in violation of the Due Process Clause of the Fourteenth Amendment ("Count Four"); (5) discrimination and denial of due process in violation of the Fourteenth Amendment as to East Hartford ("Count Five"); (6) discrimination, retaliation, and creation of a hostile work environment in violation of the CFEPA ("Count Six"); (7) aiding and abetting in violation of the CFEPA as to Chief Sansom ("Count Seven"); (8) aiding and abetting in violation of the CFEPA as to Deputy Chief Hawkins ("Count Eight"); and breach of contract ("Count Nine"). *See* Compl.

On May 21, 2021, before filing an Answer, Defendants filed a motion to dismiss the Complaint for failure to state a claim upon which relief can be granted. *See* Mot. to Dismiss ECF No. 19 ("First Mot. to Dismiss").

On June 11, 2021, Mr. Jones submitted a memorandum in opposition to Defendants' motion to dismiss. *See* Mem. in Opp'n to Defs.' Mot. to Dismiss, ECF No. 20.

On June 25, 2021, Defendants filed a reply in further support of their motion to dismiss all counts. *See* Defs.' Reply to Pl.'s Opp'n to Their Mot. to Dismiss, ECF No. 23.

On August 3, 2021, Defendants filed a motion to dismiss the breach of contract claim for lack of subject matter jurisdiction. *See* Mot. to Dismiss for Lack of Jurisdiction, ECF No. 24 ("Second Mot. to Dismiss").

On August 27, 2021, Mr. Jones filed a memorandum in opposition to Defendants' motion to dismiss for lack of subject matter jurisdiction. *See* Mem. in Opp'n to Defs.' Mot. to Dismiss for Subject Matter Jurisdiction, ECF No. 27.

On September 9, 2021, Defendants filed a reply in further support of their motion to dismiss. *See* Reply to Pl.'s Opp'n to Defs.' Mot. to Dismiss for Lack of Subject Matter Jurisdiction Over Count Nine, ECF No. 28.

The parties have filed several motions for a discovery conference based on intermittent discovery disputes. *See, e.g.*, Mot. for Disc. Conf., ECF No. 35 (Jan. 31, 2022); Pl.'s Mot. for Disc. Conf., ECF No. 39 (Mar. 4, 2021); Mot. for Disc. Conf., ECF No. 40 (Mar. 4, 2021).

The Court held a discovery conference on April 5, 2022. *see* Minute Entry, ECF No. 54, and thereafter issued an order granting leave to reopen the dispositions of Chief Sansom and Chief Daly. *See* Order, ECF No. 55.

On March 15, 2022, Mr. Jones filed a motion to amend the Complaint, seeking to add additional defendants. *See* Mot. to Amend Compl.

On March 31, 2022, the Court issued a ruling and order granting the motions to dismiss as to Mr. Jones's Title VII and CFEPA claims, except as to the hostile work environment claim, as to the constitutional claims brought against Chief Sansom in his official capacity, as to the constitutional claims brought against Deputy Chief Hawkins in his individual and official capacity, and as to the breach of contract claim. *See* Order, ECF No. 50 ("Mot. to Dismiss Order").

On April 4, 2022, Defendants filed an objection to the motion to amend the Complaint. *See* Obj. to Mot. to Amend/Correct the Compl., ECF No. 53.

On April 11, 2022, Defendants filed an emergency motion for the reopened depositions to be conducted by remote means. *See* Emergency Mot. for Dep. to be Conducted by Remote Means, ECF No. 57.

On April, 11, 2022, Mr. Jones filed a memorandum in opposition to Defendants' emergency motion, *see* Mem. in Opp'n to Defs.' Emergency Mot., ECF No. 59, and Defendants filed a reply in support of their emergency motion, *see* Reply in Resp. to Emergency Mot., ECF No. 59.

On April 12, 2022, the Court granted the emergency motion, allowing the depositions to be conducted remotely, or in the alternative, for the depositions to be rescheduled beyond the deadline for the close of discovery to be conducted in person. *See* Order, ECF No. 60.

On April 27, 2022, Defendants filed their answer to the Complaint, with their affirmative defenses. *See* Answer, ECF No. 61.

On June 9, 2022, Defendants filed a motion to amend their answer to add judicial estoppel as an additional affirmative defense. *See* Mot. to Amend Answer.

On June 15, 2022, Mr. Jones filed a motion for summary judgment. *See* Pl.'s Mot. for Summ. J., ECF No. 68.

On July 1, 2022, in the absence of any opposition, the Court granting Defendants' motion to amend their answer. *See* Order, ECF No. 73.

On July 1, 2022, Mr. Jones filed a motion of extension of time to respond to Defendants' motion to amend their answer. *See* Mot. for Extension of Time, ECF No. 75.

On July 5, 2022, the Court granted Mr. Jones's motion for extension of time and rescinded its order granting the motion to amend. *See* Order, ECF No. 75.

On July 6, 2022, Mr. Jones filed a memorandum in opposition to Defendants' motion to amend their answer. *See* Mem. in Opp'n to Mot. to Amend Answer, ECF No. 76 ("Pl.'s Opp'n to Mot. to Amend").

On July 15, 2022, Defendants filed a motion for summary judgment and opposition to Mr. Jones's motion for summary judgment. *See* Defs.' Mot. for Summ. J., ECF No. 77.

On August 1, 2022, Defendants filed a response in support of their motion to amend their answer. *See* Resp. to Mem. in Opp'n to Mot., ECF No. 79 ("Defs.' Reply in Supp. of Mot. to Amend").

On September 8, 2022, Mr. Jones filed a memorandum in opposition to Defendants' motion for summary judgment and opposition to Mr. Jones's motion for summary judgment. *See* Mem. in Opp'n to Defs.' Mot. for Summ. J., ECF No. 80 ("Pl.'s Opp'n to Defs.' Mot. for Summ. J.").

On September 22, 2022, Defendants filed a reply memorandum in support of their motion for summary judgment. *See* Reply Mem. of Law in Further Supp. of Defs.' Mot for Summ. J. and Opp'n to Pl.'s Cross-Mot., ECF No. 82 ("Defs.' Reply in Supp. of Mot. for Summ. J.").

## II.   STANDARD OF REVIEW

### A.  Motion for Summary Judgment

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may

defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in the original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."

*Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

### B.  Motion for Leave to Amend

Under Rule 15 of the Federal Rules of Civil Procedure, a party may either amend once "as a matter of course within[] 21 days" of service, or the earlier of 21 days after service of a required responsive pleading or motion under Rule 12(b), (e) or (f). Fed. R. Civ. P. 15(a)(1). Once that time has elapsed, a party may move for leave to file an amended pleading. Fed. R. Civ. P. 15(a)(2). Courts "should freely give leave [to amend] when justice so requires." *Id.*; *see also Friedl v. City of N.Y.*, 210 F.3d 79, 87 (2d Cir. 2000) ("[D]istrict courts should not deny leave unless there is a substantial reason to do so, such as excessive delay, prejudice to the opposing party, or futility."). The Second Circuit "review[s] the district court's decision to grant a party

leave to amend for abuse of discretion." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000).

Reasons for denying leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) ("The denial of leave to amend, based solely on delay and litigation expense, was an abuse of discretion. The district court's explanation cited the years of litigation and concluded: '[The] defendants have spent a vast amount of money litigating the sufficiency of various complaints in this case. This is not something unworthy of consideration. It is surely prejudice . . . .' But delay (and its necessary consequence, litigation expense) does not, without more, constitute undue prejudice.") (internal citation omitted).

## III.   DISCUSSION

### A.  The Motions for Summary Judgment

#### 1.  The Title VII and CFEPA Claims Against the Town[7]

Title VII and CFEPA prohibit an employer from discriminating in "compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate

---

[7] The standards governing CFEPA employment discrimination claims are the same as those governing Title VII. *See Martinez v. Conn. State Libr.*, 817 F. Supp. 2d 28, 55 (D. Conn. 2011) (collecting cases); *see also, e.g.*, *Craine v. Trinity Coll.*, 259 Conn. 625, 637 n.6 (2002) ("We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both." (citation omitted)). Accordingly, the Court will analyze the claims under both statutes together.

treatment . . . ,' which includes requiring people to work in a discriminatorily hostile or abusive environment." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (citation omitted).

To establish a hostile work environment under Title VII or CFEPA, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Brittell v. Dep't of Corr.*, 247 Conn. 148, 166–67 (1998) ("To establish a claim of hostile work environment [under CFEPA], 'the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'").[8] "In determining whether a plaintiff suffered a hostile work environment, [courts] must consider the totality of the circumstances." *Littlejohn*, 795 F.3d at 321.

A court ruling on a motion for summary judgment "may not properly focus on individual strands of evidence and consider the record in piecemeal fashion; rather, it must consider all of the evidence in the record, reviewing the record taken as a whole." *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012) (internal citations and quotation marks omitted). "[W]hen the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020).

---

[8] Although Mr. Jones cites to the disparate treatment framework in his briefing, his only remaining Title VII claim is a hostile work environment claim. *See* Mot. to Dismiss Order at 14 ("[T]he Title VII and CFEPA claims of disparate treatment . . . will be dismissed as time-barred."). Therefore, the Court analyzes Mr. Jones's Title VII claim under the hostile work environment framework.

Defendants argue that Mr. Jones's Title VII claim fails because the Town's conduct was not based on race, the Town's conduct was not severe or pervasive, and the Town is entitled to a *Farragher*/*Ellerth* affirmative defense. *See* Defs.' Mot. for Summ. J. at 18–28.[9]

The Court will address each argument in turn.

### i.   Because of Race

To establish a hostile work environment claim, "[a] plaintiff must . . . demonstrate that []he was subjected to the hostility because of h[is] membership in a protected class." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999). The plaintiff can make such a showing "by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). An inference of discrimination can be shown by "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal quotation marks omitted).

---

[9] Defendants also argue that Mr. Jones is collaterally estopped from moving forward with his hostile work environment claim because a federal judge granted summary judgment on Mr. Jones's prior racial discrimination claims. *See* Defs.' Mot. for Summ. J. at 21 & n.10. The Court, however, disagrees.

"[C]ollateral estoppel applies when: (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was 'actually litigated and actually decided,' (3) there was 'a full and fair opportunity for litigation in the prior proceeding,' and (4) the issues previously litigated were 'necessary to support a valid and final judgment on the merits.'" *Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008) (quoting *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986)). The prior motion for summary judgment ruling was issued on March 3, 2016. *See Jones v. E. Hartford Pol. Dep't*, No. 3:13-cv-1007-WWE, 2016 WL 1273170 (D. Conn. Mar. 3, 2016) (hereinafter "*Jones I*"). Mr. Jones's hostile work environment claim here is based on conduct that occurred from 2016 to present and therefore, necessarily includes distinct factual and legal issues that have not been "actually litigated and decided." *See NML Cap., Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172, 186 (2d Cir. 2011) (internal quotation marks omitted). Notably also, Judge Eginton found that "plaintiffs' counsel's neglect" in *Jones I* was "inexcusable" such that "the case may be dismissed on [that] ground alone." *Jones I*, 2016 WL 1273170, at *7. Therefore, collateral estoppel does not bar Mr. Jones's hostile work environment claim.

Defendants argue Mr. Jones cannot show that any of the alleged conduct was "based on [Mr. Jones's] race." Defs.' Mot. for Summ. J. at 19. More specifically, in Defendants' view, all of the conduct is race neutral. *Id.* at 20–22. Defendants argue that Mr. Jones has no comparators, cannot point to evidence of anyone using "racially degrading language," and has not identified any evidence that anyone "criticized [Mr. Jones's] performance in racially hostile ways." *Id.* at 19.

In response, Mr. Jones argues that Dispatchers Cycena and McElroy are proper comparators. *See* Pl.'s Opp'n to Defs' Mot. for Summ. J. at 6. Additionally, Mr. Jones argues that other aspects of the EHPD environment, such as "the invidious and disparate investigations conducted against Black officers and unfettered racist comments by . . . senior leadership" create an inference of discriminatory motivation. *Id.* Mr. Jones also emphasizes that Chief Sansom did not reprimand a member of senior leadership who contributed to the "racially disparate atmosphere." *Id.* Mr. Jones notes that "courts have held that evidence of discriminatory conduct directed at other employees is relevant in establishing a generally hostile environment and intent to create such an environment." *Id.* at 6–7 (first quoting *Waterson v. Plank Road Motel Corp.*, 43 F. Supp. 2d 284, 288 (N.D.N.Y. 1999); and then citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415–16 (10th Cir. 1987); and *EEOC v. A. Sam Sons Produce Co.*, 872 F. Supp. 29, 36 (W.D.N.Y. 1994)).

The Court agrees in part.

Here, there are disputed issues of fact concerning whether the Town, based on the conduct of the relevant supervisors, possessed the requisite discriminatory motive. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010) ("[A]n employer is presumed to be

responsible where the perpetrator of the harassment was the plaintiff's supervisor.") (citations omitted).

Mr. Jones has submitted evidence, most of which is disputed, from which a reasonable jury could infer discriminatory motive. For example, according to EHPD's internal affairs history, a Caucasian officer was disciplined multiple times before being terminated.[10] *See* Ex. 4 to Pl.'s Opp'n to Defs.' Mot. for Summ. J., ECF No 80-6 ("IA History"). This officer violated safety rules and was absent without official leave ("AWOL") in 2014 and was required to attend counseling; the officer was alleged to have used excessive force in 2014 but was exonerated; the officer was again alleged to have used excessive force in 2015 but was exonerated; the officer "failed to follow directives" in 2017 and was required to attend counseling; the officer was insubordinate, perpetuated "workplace violence," and failed to submit reports in 2018 and was suspended for 2 days and required to attend counseling; and the officer was tardy and/or "untruthful[]," AWOL, and insubordinate in 2019 and was suspended for 3 days and received a written reprimand. *See id.* at 1–2. In 2020, the same officer was terminated because he was insubordinate, failed to follow orders, conducted an improper investigation, failed to complete reports, and failed to complete a "DV warrant." *Id.* at 3. Chief Sansom, as the hiring and firing authority for officers, was involved in each of these decisions. *See* Ex. EE to Defs.' Mot. for

---

[10] This officer is similarly situated in all material respects because his discipline was decided by the same decision-maker, he was subject to the same disciplinary standards, and he engaged in comparable conduct in that he was found to be untruthful on multiple occasions and failed to follow EHPD policy rules, among other things. *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010). Mr. Jones was terminated for his misuse of COLLECT because he lied about using it for law enforcement purposes, in violation of EHPD policy. *See* Defs.' Statement of Facts ¶ 13 ("On February 22, 2013, [Mr. Jones] was terminated . . . for '[k]nowingly access[ing] the COLLECT system to obtain information for personal reasons and/or curiosity,' and '[k]nowingly enter[ing] false, improper and inaccurate information into the COLLECT system.'"); *id.* ¶¶ 44, 46 (stating that "IA 13-04 concluded that [Mr. Jones] engaged in additional violations of the EHPD Department Rules and Regulations, including additional misuse of COLLECT" and therefore, "Chief Sansom sustained the allegations and terminated [Mr. Jones].").

Summ. J. at 110:12–111:6, ECF No. 77-34 (noting Chief Sansom was involved in hiring and firing decisions).[11]

Viewing the evidence in the light most favorable to Mr. Jones, and in light of the approach Chief Sansom took with Mr. Jones's first-time infractions, a reasonable jury could infer that Chief Sansom's disciplinary treatment of certain Caucasian officers, in opting to not terminate them until there have been many infractions over several years, is evidence of discriminatory motivation. *See Littlejohn*, 795 F.3d at 312 (stating that "more favorable treatment of employees not in the protected group[] or the sequence of events leading to the plaintiff's discharge" can be evidence of discriminatory motivations (internal quotation marks omitted)); *see also DeAngelis v. City of Bridgeport*, No. 3:14-cv-01618 (JAM), 2017 WL 3880762, at *7 (D. Conn. Sept. 5, 2017) ("The testimony of several employees that the City's supervisors behaved in a verbally abusive, hostile manner toward women and not toward men could allow a reasonable jury to conclude that plaintiff was exposed to the hostile work environment she describes because of her gender.").

In addition to this evidence, there are other disputed facts in the record concerning conduct directed at other officers that is relevant to determining if there was improper discriminatory motivation. *See Kaytor*, 609 F.3d at 548–49 (finding it relevant to plaintiff's gender-based hostile work environment claim that a supervisor "ma[de] fun of other women and discuss[ed] their bodies" because "a factfinder would be entitled to take them into consideration in assessing the work environment and in determining whether the abuse . . . was motivated by gender"). For example, Mr. Jones has pointed to evidence that, in November 2020, an

---

[11] Chief Sansom also testified to overturning a suspension for a white officer who was found liable in federal court for using excessive force against a "Spanish child." *See* Ex. 3 to Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 212:5–216:12.

anonymous e-mail was sent to all EHPD staff that addressed a blog post by former executive board member Frank Iacono that purportedly "label[ed] the [EHPD] administration as racist." *See* Ex. 27 to Pl.'s Mot. for Summ. J. at 2, ECF No. 68-30 ("Let's examine why[] Iacono used his opinion to label the administration as racist. That may or may not be true, but the evidence Iacono outlined didn't establish that fact, what it did do was put his opinion out as that of all Association members, thus putting all Association members in legal jeopardy, both civilly and criminally.").

Therefore, the Court cannot grant summary judgment on this record because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences" remain. *Anderson*, 477 U.S. at 255 (1986); *see also Kaytor*, 609 F.3d at 548 ("[I]n the context of a claim of . . . harassment, where state of mind and intent are at issue, . . . '[s]ummary judgment should be used sparingly.'" (quoting *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998)); *Raniola v. Bratton*, 243 F.3d 610, 623 (2d Cir. 2001) (stating that questions regarding motives for defendant's alleged discriminatory conduct are matters of fact that should be resolved by a jury).

Accordingly, Mr. Jones's motion for summary judgment on this issue will be denied and Defendants' motion for summary judgment on this issue will be denied.[12]

---

[12] In denying this motion for summary judgment on this ground, the Court has not – and cannot – definitively decide whether any or all of this alleged evidence of discriminatory motive will be admissible at trial. *See Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017) ("[M]aterial relied on at summary judgment need not be admissible in the form presented to the district court . . . so long as the evidence in question 'will be presented in admissible form at trial,' it may be considered on summary judgment."); *see also In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 471, 476 (S.D.N.Y. 2009) (noting that courts retain discretion to "reserve judgment" on evidentiary issues "until trial, so that the [issue] is placed in the appropriate factual context." (internal quotation marks omitted)).

### ii. Severe and Pervasive

To establish a hostile work environment under Title VII, a plaintiff must also show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (citations and internal quotation marks omitted). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (citing *Harris*, 510 U.S. at 21–22).

"The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (internal quotation marks omitted). In determining whether a plaintiff established there was a hostile work environment, courts must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Mr. Jones argues that the Town created a hostile work environment through a number of incidents, such as demoting Mr. Jones to the Police Service Aide position; failing to adequately assist Mr. Jones's efforts to get recertified by COLLECT and POSTC; "subject[ing] [Mr. Jones] to daily humiliation and ostracism" by requiring him to wear a different uniform; putting Mr. Jones in physical danger by requiring him to "assist in the security of the police department lobby" while unarmed and without protective gear; ordering Mr. Jones to not leave the building during the work day; not adequately responding to Mr. Jones's concerns for his safety and

requests to wear a different uniform; and not allowing Mr. Jones a lunch break. *See* Mot. for Summ. J. at 8–9. Mr. Jones argues that the Town intended to use these measures to force him to quit. *Id.* at 9–10. Mr. Jones also emphasizes that these conditions were "physically threat[en]ing and humiliating" and therefore, "unreasonably interfere[ed] with [his] work performance." *Id.* at 10.

Defendants argue that much of the conduct that Mr. Jones relies on falls outside of the statute of limitations and therefore should not be considered. *See* Defs.' Mot. for Summ. J. at 24. Additionally, in Defendants' view, Mr. Jones's "allegations are simply false or a misrepresentation of the record." *Id.* Moreover, Defendants argue that their alleged conduct cannot support a hostile work environment claim because Defendants took all necessary steps to assist Mr. Jones's efforts to get recertified with COLLECT and POSTC. *Id.* at 24–26. Additionally, with respect to Mr. Jones's Police Service Aide uniform, Defendants contend that the different color was necessary to distinguish him from the other police officers. *Id.* at 26. Finally, Defendants dispute that Mr. Jones was ever in danger while working as a Police Service Aide because he was behind a bulletproof glass wall, and the "one time he had to collect a firearm . . . is insufficient to be severe and pervasive." *Id.*

The Court disagrees.

The parties do not dispute that Mr. Jones subjectively "perceive[d] the work environment to be abusive," *Raspardo*, 770 F.3d at 114 (citing *Harris*, 510 U.S. at 21–22), and therefore, the Court focuses its analysis on the objective component of the test.

In a hostile work environment claim, "'the crucial inquiry focuses on the nature of the workplace environment as a whole,' and 'a plaintiff who [himself] experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to

support [his] claim.'" *Kaytor*, 609 F.3d at 546 (citations omitted). Even if the discriminatory conduct is "merely episodic and not itself severe, the addition of physically threatening . . . behavior may cause offensive or boorish conduct to cross the line into actionable . . . harassment." *Id.* at 547 (citations and quotation marks omitted).

Additionally, "facially neutral incidents may be included . . . among the totality of the circumstances" as long as "a reasonable fact-finder could conclude that they were, in fact, based on [race]." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002). To find such facially neutral evens relevant, "some circumstantial or other basis" must exist "for inferring that [the] incidents . . . were in fact discriminatory." *Id.* This circumstantial evidence may include evidence that "the same individual" engaged in "multiple acts of harassment," some of which were overtly discriminatory. *Id.* at 375.

The parties do not dispute that Mr. Jones was required to wear a different uniform from his reinstatement in November 2016 until March 2020, when COVID-19 prompted a change in uniform policy. *See* Defs.' Mot. for Summ. J. at 26. The parties do, however, offer competing reasonable interpretations of this particular fact. *See* Pl.'s Statement of Facts ¶ 43 (stating that Mr. Jones complained about his new uniform because "he felt like he was being alienated because he has to wear a different uniform" and Deputy Chief Hawkins responded that the uniform choice "was not open for discussion and [Mr. Jones] does not have an option in the matter"); Defs.' Statement of Facts ¶ 102 (stating that Mr. Jones was assigned a different uniform to designate that he was not a police officer).

Additionally, the parties dispute several facts, which, under a totality of the circumstances analysis, are material. More specifically, the parties dispute whether Mr. Jones was regularly put in danger due to the duties the Town assigned him and the fact that he was

unarmed, and whether Mr. Jones was ordered not to leave the building during work hours. *See* Pl.'s Resp. to Defs.' Statement of Facts ¶¶ 94–95, 98–101; Defs.' Resp. to Pl.'s Statement of Facts ¶¶ 44, 47–51.

Taken together, and drawing all reasonable inferences in Mr. Jones's favor, the claimed "more favorable treatment of [officers] not in the protected group" discussed above; "the sequence of events leading to [Mr. Jones's]" reinstatement; Mr. Jones's duties as an unarmed Police Service Aide, particularly the "humiliating" uniform that may have put Mr. Jones in danger, the position's duties that were potentially dangerous for an unarmed civilian to perform, and the order that Mr. Jones not leave the building; and the evidence of discrimination directed at other employees, such as the November 2020 e-mail, could lead a reasonable jury to conclude that Mr. Jones's work environment after he was reinstated in 2016 was "severe or pervasive enough that a reasonable person would find it hostile or abusive." *Raspardo*, 770 F.3d at 114 (citing *Harris*, 510 U.S. at 21–22); *see also Ramsy*, 952 F.3d at 389–90 (finding the plaintiff's hostile work environment claim survived summary judgment where she alleged "numerous incidents" of harassment, some overtly discriminatory and some facially neutral, "over the course of at least three years" and the employer "failed to respond appropriately" to "repeated complaints").

Therefore, summary judgment is inappropriate because the parties have put forth competing material facts and provided alternate reasonable interpretations for undisputed evidence. *See Anderson*, 477 U.S. at 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] ruling on a motion for summary judgment.").

Accordingly, Mr. Jones's motion for summary judgment on this issue will be denied and Defendants' motion for summary judgment on this issue will be denied.

### iii. The *Faragher/Ellhert* Affirmative Defense

An employer may avoid liability for a supervisor's harassment where it shows that (1) "the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior" and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *see also Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (hereinafter "*Faragher/Ellhert* defense").

Defendants argue that the Town is entitled to summary judgment based on a *Faragher/Ellhert* defense because Mr. Jones could have complained about the racial harassment using the procedures set out in the collective bargaining agreement and the Town's anti-harassment policy, but he did neither. *See* Defs.' Mot. for Summ. J. at 27.

Mr. Jones argues that Defendants have not met their burden for this affirmative defense because the policies identified were "ambiguous." Pl.'s Mot. for Summ. J. at 11. Additionally, Mr. Jones argues that because his claims are "focused on senior management," that Defendants cannot show they have "worked to 'prevent harassing behavior.'" *Id.* Mr. Jones also notes that he complained to two deputy chiefs and Chief Sansom about the hostile work conditions they established. *Id.*

The Court agrees.

The EHPD's "Policy Prohibiting Harassment" states that employees can report harassment to the following people: "any Supervisor; your Department Directors; the Director of Human Resources[;] . . . or the Mayor." Ex. LL to Defs.' Mot. for Summ. J. at 3, ECF No. 77-41

("EHPD Harassment Policy"). The EHPD Harassment Policy states that "[a]ny Supervisor . . .

who receives a . . . report of harassment . . . must immediately notify the Director of Human

Resources . . . or the Mayor's Office." *Id.* Notably, "Supervisors also should take the appropriate

interim steps to stop the offending behavior while the report is being processed, such as

separating the alleged offender and victim" and "[i]gnoring such conduct may result in

discipline, up to and including discharge." *Id.*

Additionally, the collective bargaining agreement states that "[a]ny employee" can file a

grievance "within twenty (20) calendar days of the occurrence or event giving rise to the

grievance" and "submit it to the Chief, or his designee." Ex. CC to Defs.' Mot. for Summ. J. at

37, ECF No. 77-32 ("Collective Bargaining Agreement"). The Collective Bargaining Agreement

states that the Chief shall provide a written decision to the employee within fourteen days. *Id.* If

this does not resolve the dispute, the employee can submit a written grievance to the Town

Director of Human Resources, who must meet with the employee within fifteen days and provide

a written decision within ten days of the meeting. *Id.* If this step does not resolve the dispute,

either party may request that the SBMA provide an arbitration decision. *Id.*

In 2017, Mr. Jones told Deputy Chief Hawkins that he felt he was unsafe leaving the

building and alienated because he was required to wear a different uniform. *See* Ex. 12 to Pl.'s

Mot. for Summ. J. at 157:24–158:6, ECF No. 68-15 ("Hawkins Dep."). The parties dispute

Deputy Chief Hawkins's response to Mr. Jones's safety concerns but agree that Mr. Jones was

required to wear the different uniform until March 2020. *See* Defs.' Resp. to Pl.'s Statement of

Facts ¶ 43 (noting a dispute concerning whether Mr. Jones complained about his new uniform

because "he felt like he was being alienated because he has to wear a different uniform" and

whether Deputy Chief Hawkins responded that the uniform choice "was not open for discussion and [Mr. Jones] does not have an option in the matter").

There are genuine disputes of material fact as to whether EHPD reasonably provided the corrective measures detailed in the EHPD Harassment Policy and the Collective Bargaining Agreement. Specifically, the evidence that Mr. Jones complained to Deputy Chief Hawkins and that his complaints were ignored at least "raises questions regarding whether the [policy] was a viable means of reporting racial discrimination." *Lamarr-Arruz v. CVS Pharmacy, Inc.*, 271 F. Supp. 3d 646, 661 (S.D.N.Y. 2017) (denying summary judgment where the plaintiff testified that he complained about racial harassment to the employer's ethics hotline and no actions were taken); *Alonzo v. Chase Manhattan Bank, N.A.*, 70 F. Supp.2d 395, 397–98 (S.D.N.Y. 1999) (finding that while defendant provided sufficient evidence that it had an anti-discrimination policy, the policy could not prevent the defendant from being held liable where a "senior official" knew of the harassment and a question of fact existed as to whether his response was reasonable).

Additionally, while the Collective Bargaining Agreement provides grievance procedures, those procedures required Mr. Jones to submit his grievance to Chief Sansom, the subject of his complaint, and does not appear to provide an alternative method for submitting a grievance. *See Faragher*, 524 U.S. at 779 (finding it significant that the "policy did not include" anything to indicate that "harassing supervisors . . . could be bypassed in registering complaints" and finding as a matter of law that the defendant "could not be found to have exercised reasonable care to prevent the supervisors' harassing conduct").

Accordingly, Defendants have not met their burden of proof for the *Faragher*/*Ellhert* defense and their motion for summary judgment will be denied on these grounds.

**2. The CFEPA Aiding and Abetting Claim Against Chief Sansom and Deputy Chief Hawkins**

Under Connecticut General Statutes § 46a-60(b)(5), it is a "discriminatory practice . . . [f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or attempt to do so." "The law in Connecticut is clear that while an individual employee may be held liable for aiding and abetting his employer's discrimination, an employer can not be liable for aiding and abetting its own discriminatory conduct." *Farrar v. Town of Stratford*, 537 F. Supp. 2d 332, 356 (D. Conn. 2008). "CFEPA aiding and abetting liability . . . requires that the individual assists another person in discriminatory conduct and a sole perpetrator cannot be held liable." *Brauer v. MXD Grp., Inc.*, No. 3:17-cv-2131 (VLB), 2019 WL 4192181, at *12 (D. Conn. Sept. 4, 2019) (quoting *Bolick v. Alea Grp. Holdings, Ltd.*, 278 F. Supp. 2d 278, 282 (D. Conn. 2003)).

Mr. Jones argues that Chief Sansom aided and abetted the Town in creating a hostile work environment because he is the final authority for terminating EHPD employees, he is responsible for enforcing EHPD policies, and he "refus[ed] or neglect[ed] to prohibit discrimination against" Mr. Jones. *See* Pl.'s Mot. for Summ. J. at 20. Mr. Jones argues that Deputy Chief Hawkins aided and abetted the Town in creating a hostile work environment because he "order[ed] that Plaintiff wear a humiliating uniform, not leave the building[,] and perform functions that were inherently dangerous." *Id.* at 21.

Defendants argue Mr. Jones's aiding and abetting claims must fail because Mr. Jones has failed to put forth a CFEPA hostile work environment claim against the Town. *See* Defs.' Mot. for Summ. J. at 29. Defendants also argue that "there is no evidence that either Chief Sansom or [Deputy] Chief Hawkins engaged in severe or pervasive conduct to aid the other or the Town in

harassing Plaintiff because of his race." *Id.* Finally, Defendants argue that Chief Sansom and

Deputy Chief Hawkins cannot "be held liable because of their own conduct" because "CFEPA

aiding and abetting liability requires the individual defendant assist another person in

discriminatory conduct." *Id.* at 29–30.

The Court disagrees.

The Defendants rely on *Bolick v. Alea Group Holdings*, for the proposition that Chief

Sansom and Deputy Chief Hawkins cannot be held liable for "their own conduct" because

CFEPA requires that they "assist another person in discriminatory conduct." *Id. Bolick*, however,

makes clear that its rationale only applies where the plaintiff attempts to hold the employer liable

for aiding and abetting under CFEPA. 278 F. Supp. 2d at 282–83. More specifically, "[w]hile an

employer cannot aid and abet his own discriminatory practice, *Jones v. Gem Chevrolet*, 166 F.

Supp. 2d 647, 649 n.1 (D. Conn 2001), an individual may aid and abet his employer's

discrimination." *Bolick*, 278 F. Supp. 2d at 282 n.5. CFEPA's aiding and abetting liability "is

particularly applicable to supervisors in the use of their authority," as is the case here with Chief

Sansom and Deputy Chief Hawkins, "even where the employer's liability is derived from the

supervisor's wrongful conduct." *See id.* (citing *Wasik v. Stevens Lincoln-Mercury, Inc*., No. CIV.

3:98-CV-1083 (DJS), 2000 WL 306048, at *6 (D. Conn. Mar. 20, 2000)).

Mr. Jones has not alleged general CFEPA liability against Chief Sansom or Deputy Chief

Hawkins, although their conduct forms part of the potential basis for the Town's CFEPA

liability. Instead, Mr. Jones has alleged that the Town is liable under CFEPA's main provisions

and Chief Sansom and Deputy Chief Hawkins are liable for aiding and abetting the Town. *See*

Compl. ¶¶ 65–72 (Count One alleging the Town violated Title VII), 104–111 (Count Six

alleging the Town violated CFEPA), ¶¶ 112–117 (Count Seven alleging Chief Sansom violated

CFEPA's aiding and abetting provisions), 118–123 (Count Eight alleging Deputy Chief Hawkins violated CFEPA's aiding and abetting provisions).

As Mr. Jones correctly points out, and as the Court discussed at length above, Chief Sansom and Deputy Chief Hawkins were both personally involved in incidents that are directly relevant to the Town's potential liability under CFEPA. *See supra* Part III.A.1.i–ii (including, for example, that Deputy Chief Hawkins may have ordered Mr. Jones not to leave the building and the Chief Sansom may have been involved in disciplinary decisions that treated white officers more favorably). And, as discussed above, there are a genuine disputes of material fact concerning those incidents. *Id.*

Therefore, there are genuine disputes of material facts concerning Chief Sansom's and Deputy Chief Hawkins's CFEPA aiding and abetting liability. *See Colapietro v. Dep't of Motor Vehicles*, No. 3:08-cv-238 (WWE), 2010 WL 2596519, at **1–3, 11 (D. Conn. June 24, 2010) (denying the individual defendant's motion for summary judgment on the CFEPA aiding and abetting claim where the employer's CFEPA liability was based on the individual defendant's misconduct because the plaintiff "adduced sufficient evidence [to] raise[] genuine issues of fact as to whether [the individual defendant] initiated, encouraged or facilitated the discriminatory practices resulting in a sexually hostile environment").

Accordingly, the Court will deny Mr. Jones's and Defendants' motions for summary judgment as to this count.

### 3. The Equal Protection Clause Claim

The Equal Protection Clause of the Fourteenth Amendment protects public employees from race discrimination and retaliation for complaining about race discrimination. *See Vega v. Hempstead Union Free Sch. Dist*, 801 F.3d 72, 82 (2d Cir. 2015). Public employees may bring

discrimination and retaliation claims under 42 U.S.C. § 1983 against "responsible persons acting under color of state law." *Id.* at 87. Any state employee "acting in his official capacity" acts "under color of state law." *Id.* at 88 (internal quotation marks omitted). A § 1983 claim also must allege that "as a result of the defendant's actions, the plaintiff suffered a denial of [his or] her federal statutory rights, or [his or] her constitutional rights or privileges." *Padilla v. Harris*, 285 F. Supp. 2d 263, 267 (D. Conn. 2003) (citing *Annis v. Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998)) (internal quotation marks omitted).

There are two "distinct pathways for proving a non-class-based Equal Protection violation." *Hu v. City of New York*, 927 F.3d 81, 93 (2d Cir. 2019). First, under a selective treatment theory, plaintiffs must plausibly allege that: "(1) the person, compared with others similarly situated, was selectively treated; and (2) such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *King v. City of New York*, 581 F. Supp. 3d 559, 576 (S.D.N.Y. 2022) (quoting *Crowley v. Courville*, 76 F.3d 47, 52–53 (2d Cir. 1996)) (hereinafter, a "*LeClair* claim").

Second, "[t]he Supreme Court has also recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges [(1)] that she has been intentionally treated differently from others similarly situated and [(2)] that there is no rational basis for the difference in treatment." *Servidio Landscaping, LLC v. City of Stamford*, No. 3:19-CV-01473 (KAD), 2020 WL 7246441, at *3 (D. Conn. Dec. 9, 2020) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (quotation marks omitted)) (hereinafter, an "*Olech* claim").

Mr. Jones argues that Defendants were "motivated by ill will" because Mr. Jones had filed several discrimination lawsuits against them and because EHPD was racially hostile. *See* Pl.'s Mot. for Summ. J. at 13, 15. Mr. Jones argues that he was treated more harshly than similarly situated comparators, Dispatchers Cycena and McElroy, who are both Caucasian women. *See id.* at 13.

Mr. Jones argues that his harsher treatment must be placed in the larger context. More specifically, he points to evidence that former Lieutenant Stoldt improperly investigated officers based on race, made racially hostile comments to Officer Mark Allen, and had "numerous pictures of Black people in his office." *Id.* at 14–15. Mr. Jones also argues that Chief Sansom's failure to investigate the November 2020 "racially charged" e-mail is also evidence that his actions toward Mr. Jones were motivated by ill will. *Id.* at 15.

Defendants argue that Mr. Jones's equal protection claim should be barred by *Enquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), in which the Supreme Court held that *Olech* "class of one" claims have "no place in the public employment context" because employment decisions are highly discretionary and thus "treating seemingly similarly situated individuals differently . . . is par for the course." Defs.' Mot. for Summ. J. at 33. Defendants argue that, although the Second Circuit has not held that *Enquist* applies to *LeClair* claims, the underlying reasoning of *Enquist* is the same in both the *Olech* and *LeClair* contexts. *Id.* at 33–36.

In the alternative, Defendants argue that Mr. Jones has failed to put forth sufficiently similar comparators that were treated more favorably. *See id.* at 36. More specifically, Defendants contend that Dispatchers Cycena and McElroy are not similarly situated because Chief Sirois, not Chief Sansom, oversaw their discipline, the dispatchers are subject to different

disciplinary standards because they are civilians and members of a different union, and the
dispatchers do not require certification by the state. *See id.* at 37–39.

Additionally, Defendants argue there is no evidence of improper motivation. More
specifically, Defendants contend that Chief Sansom's decision to not send the 2019 letter could
not have been motivated by Mr. Jones's racial discrimination claims because Mr. Jones "only
once asserted race discrimination – in his 2013 lawsuit." *Id.* at 40. Defendants also emphasize
that Mr. Jones "has no constitutional right to treatment . . . that would immunize him from the
consequences of serious misconduct." *Id.* (quoting *Diesel v. Town of Lewisboro*, 232 F.3d 92,
104 (2d Cir. 2000)).

In response, Mr. Jones argues that *Enquist* does not bar his claim because the *Enquist*
Court eliminated claims for public employees subjected to different treatment for arbitrary
reasons, whereas, here, Mr. Jones is not alleging he was treated arbitrarily but instead that he was
treated differently than white employees based on his race. *See* Pl.'s Opp'n to Defs.' Mot. for
Summ. J. at 17. Mr. Jones argues that *LeClair* "protects against both discrimination on the bases
of a plaintiff's protected status . . . and discrimination on the basis of a defendant's personal
malice or ill will towards a plaintiff." *Id.* at 22–23.

Mr. Jones also argues that Dispatchers Cycena and McElroy are similarly situated to him
because they also violated COLLECT for personal reasons and both police officers and
dispatchers must have the same COLLECT certification. *Id.* at 24.

The Court disagrees.

As an initial matter, Mr. Jones's race-based and malice-based selective enforcement
claims are not categorically barred by *Enquist*. *Cf. Hu*, 927 F.3d at 100 n.5 (noting that, where

plaintiff raised both race and malice-based selective enforcement claims, there is an open question about the effect of *Engquist*).

Additionally, in its ruling and order granting in part and denying in part Defendants' motions to dismiss, this Court held that Mr. Jones's equal protection claims based upon adverse employment actions that occurred before March 30, 2018, including Mr. Jones's alleged terminations in 2013 and 2015 and his alleged demotion to Police Service Aide in 2017, were time barred. Mot. to Dismiss Order at 20–21. Therefore, the Court focuses its analysis on Mr. Jones's allegation that Defendants refused to reinstate him as a police officer when Chief Sansom declined to send a 2019 letter requesting that COLLECT reconsider its decision to not recertify Mr. Jones.

"'[A] showing that the plaintiff was treated differently compared to others similarly situated' is a 'prerequisite' and a 'threshold matter' to a selective enforcement claim." *Bey v. City of New York*, 210 F. App'x 50, 53 (2d Cir. 2006) (quoting *Church of the Am. Knights of the KKK v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004)). A plaintiff must establish both the existence of comparators who are similarly situated, and differential treatment from such comparators. *See Church of Am. Knights of the Ku Klux Klan*, 356 F.3d at 210 (describing showing of "similarly situated" comparators as a "threshold" requirement and showing of "differential treatment" as "a prerequisite to selective enforcement").

"While *Olech* [claims] require[] an 'extremely high' degree of similarity between a plaintiff and comparator, *LeClair* [claims] merely require[] a 'reasonably close resemblance' between a plaintiff's and comparator's circumstances" in all material respects. *Servidio Landscaping, LLC*, 2020 WL 7246441, at *3 (quoting *Hu*, 927 F.3d at 93) (alteration in original).

40

Even assuming that Dispatchers Cycena and McElroy were similarly situated to Mr. Jones due to the similarity of their conduct, they were not treated differently in terms of actions taken by Defendants. More specifically, Mr. Jones's initial discipline, the prior terminations and demotion to Police Service Aide, is not the subject of his equal protection claim. *See* Mot. to Dismiss Order at 20–21. Instead, Chief Sansom's refusal to send the 2019 letter requesting that COLLECT recertify Mr. Jones is the only basis of a viable equal protection claim. *See id.*

Mr. Jones did not lose his certification because he was terminated. Mr. Jones was initially terminated on February 22, 2013 and again terminated on February 5, 2015. *See* Defs.' Statement of Facts ¶¶ 13, 46; Pl.'s Statement of Facts ¶¶ 2, 7. Mr. Jones, however, did not lose his POSTC and COLLECT certification until it lapsed on June 30, 2016.[13] *See* Ex. X to Defs.' Mot. for Summ. J. at 1, ECF No. 77-27; Ex. DD to Defs' Mot. for Summ. J. at 88:24–89:10, ECF No. 77-33 ("Feb. 3, 2022 Jones Dep."). The dispatchers, on the other hand, never lost their COLLECT certifications, and therefore, did not need any help from Chief Sansom to get recertified. Moreover, Mr. Jones has not presented any evidence suggesting that Chief Sansom would have been more helpful to the dispatchers if they had needed to get recertified on COLLECT. *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010) (noting that a comparator was not treated differently where the plaintiff "present[ed] no evidence suggesting that [the comparator] would have been allowed to remain in her job if she had not resigned, or that defendants would not have treated [the plaintiff] the same way if he had resigned").

---

[13] The record is not clear about whether Mr. Jones would have been able to renew his COLLECT certification while he was not officially employed by EHPD; this fact, however, is not dispositive. *See* Feb. 3, 2022 Jones Dep. at 89:11–90:10. Even if Mr. Jones lost his COLLECT certification because of his termination and could not have renewed it while not employed by a police department, the dispatchers were still not treated differently than Mr. Jones, as discussed in more detail below and above, in terms of Chief Sansom's efforts to recertify Mr. Jones.

Because of this difference, Mr. Jones cannot show that the dispatchers were treated differently. *See Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 254 (E.D.N.Y. 2010) ("Here, plaintiffs' burden is to demonstrate that other residents who were issued tickets for, e.g., lack of a rental permit, continued to not comply with the law at issue, e.g., the rental permit law, but did not receive subsequent summonses for their continued non-compliance."), *on reconsideration in part*, 814 F. Supp. 2d 242 (E.D.N.Y. 2011); *Spinks v. Orleans Cnty.*, No. 10-CV-745, 2011 WL 2491001, at *7 (W.D.N.Y. June 22, 2011) ("Selective treatment by a governmental entity implies some sort of conscious decision to take action against some people but not others against whom the same action could be taken.").[14]

Accordingly, Mr. Jones's equal protection claim fails and the Court therefore need not, and does not, address whether Defendants are entitled to qualified immunity. Defendants motion for summary judgment on this count will be granted and Mr. Jones's motion for summary judgment on this count will be denied.

### 4. The Procedural Due Process Claim

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "In order to prevail on a § 1983 claim for violation of the procedural due process rights guaranteed by the Fourteenth Amendment, the plaintiff must show (1) that he possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process." *Arrocha v. City Univ. of N.Y.*,

---

[14] Because the Court has found that Mr. Jones cannot maintain his equal protection claim, the Court will not address Defendants' argument related to judicial estoppel.

878 F. Supp. 2d 364, 372 (E.D.N.Y. 2012) (internal quotation marks and citation omitted), *aff'd*, 523 F. App'x 66 (2d Cir. 2013) (summary order).

"To determine whether a plaintiff was deprived of property without due process of law in violation of the Fourteenth Amendment," courts must "identify the property interest involved." *Taravella v. Town of Wolcott*, 599 F. 3d 129, 133 (2d Cir. 2010) (internal quotation marks omitted). "Such property interests are typically not created by the Constitution, but instead by an independent source," including statutes, contracts, or rules "entitling the citizen to certain benefits." *Radwan v. Manuel*, 55 F.4th 101, 124–25 (2d Cir. 2022) (internal citation marks omitted) (quoting *Goss v. Lopez*, 419 U.S. 565, 572–73 (1975)); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) (holding that constitutionally protected property interests are created and defined by existing rules or understandings "stem[ming] from an independent source," which source supports a "legitimate claim of entitlement").

Mr. Jones argues that he has a constitutionally protected property interest in "his position as a police officer working for the Town of East Hartford." Pl.'s Mot. for Summ. J. at 17. Mr. Jones contends that his property interested is based on the MOA and the collective bargaining agreement. *Id.* In Mr. Jones's view, his due process rights were violated when Chief Sansom failed to take "all steps necessary" to help him get recertified with COLLECT. *Id.*

Defendants argue that Mr. Jones's property right cannot be based in the collective bargaining agreement because that agreement only "protects [Mr. Jones] from termination absent 'just cause.'" Defs.' Mot. for Summ. J. at 42 n.22. Defendants emphasize that Mr. Jones's procedural due process claim is based on the December 2019 letter, not Mr. Jones's previous terminations. *Id.* Defendants next argue that the MOA does not create a constitutionally protected property interest because, while the MOA provided that the Town would "take all steps

necessary to assist [Mr. Jones] in his efforts to receive recertification to access and use the . . .

COLLECT System," the MOA did not define the specific steps necessary. *Id.* at 44. Therefore, in

the Town's view, this amounts to only a contract dispute rather than a constitutionally protected

property interest. *Id.* at 44–45 (citing *Costello v. Town of Fairfield*, 811 F.2d 782, 784 (2d Cir.

1987)).

      The Court agrees.

      As with the equal protection claim, Mr. Jones is limited to allegations that occurred after

March 30, 2018. *See* Mot. to Dismiss Order at 20–21. Therefore, his procedural due process

claim is based on Chief Sansom's refusal to send the 2019 letter to COLLECT, which Mr. Jones

argues violates the MOA.

      The Second Circuit has been "reluctant to surround the entire body of public contract

rights with due process protections." *Radwan*, 55 F.4th at 125 (quotation marks omitted)

(quoting *S & D Maint. Co. v. Goldin*, 844 F.2d 962, 967 (2d Cir. 1988)). "In the employment

context, protected property interests may exist where there is an expectation that the relationship

will continue for a period of time, or where the interest may not be terminated without cause." *Id.*

(first citing *Perry v. Sindermann*, 408 U.S. 593, 602 (1972); and then citing *O'Connor v.

Pierson*, 426 F.3d 187, 196 (2d Cir. 2005) ("[T]he state-law property interest of government

employees who may only be discharged for cause . . . is a constitutionally protected property

interest for purposes of the Fourteenth Amendment.")).

      Mr. Jones cannot show that he has a constitutionally protected property interest in a

position as a certified police officer because the MOA does not require the Town to re-hire Mr.

Jones as a police officer, but instead contemplates a civilian position for Mr. Jones if he is not

recertified as a police officer. *See Cancel v. N.Y.C. Human Res. Admin./Dep't of Soc. Servs.*, 527

Fed. App'x. 42, 44 (2d Cir. 2013) ("Generally, there is no constitutionally protected property interest in prospective government employment, but a written or verbal communication guaranteeing government employment may, in some circumstances, give rise to such a property interest." (internal quotation marks and citations omitted)). *Cf. Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 212 (2d Cir. 2003) (finding that the plaintiff had a constitutionally protected property right "to be reappointed to any vacant position for which she was qualified" based on the text of the collective bargaining agreement that expressly guaranteed such reappointment).

"An interest in enforcement of an ordinary commercial contract with a state is qualitatively different from the interests the Supreme Court has thus far viewed as 'property' entitled to procedural due process protection." *S & D Maintenance*, 844 F.2d at 966 (citations omitted). "[T]he Due Process Clause is invoked to protect something more than an ordinary contractual right. Rather, procedural protection is sought in connection with a state's revocation of a status, . . . [such as] extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both." *Id.*; *see also Costello*, 811 F.2d at 784–85 (finding that the plaintiff failed to show he had a constitutionally protected property right in increased retirement benefits based on a collective bargaining agreement because the claim amounted to "interpretation of a contract term" and "[a] contract dispute . . . does not give rise to a cause of action under section 1983").

Mr. Jones cannot show that the MOA provisions that state the Town must take "all steps necessary" to help him get recertified with COLLECT and POSTC create a constitutionally protected property interest. His purported entitlement to the Town's help, and the definition of what that help must be, is based entirely on a contract provision. Notably, the contract provision

was not mandatory or clear, and the entitlement is not one of "extreme dependence" or "permanence" such as welfare benefits or a tenured position. *See Dohrmann-Gallik v. Lakeland Cent. Sch. Dist.*, No. 14-cv-4397 (NSR), 2015 WL 4557373, at \*\*6–7 (S.D.N.Y. July 27, 2015) (finding the plaintiff did not have a constitutionally protected property interest in supplemental sick leave based on an interpretation of a collective bargaining agreement because the claimed entitlement was "purely contractual," did "not have a character or quality of 'extreme dependence' or 'permanence,'" and was not "clear and mandatory"); *see also Krukenkamp v. State Univ. of N.Y. at Stony Brook*, 395 F. App'x 747, 751 (2d Cir. 2010) (summary order) (affirming district court's grant of summary judgment where the plaintiff argued that his procedural due process rights were violated when the defendants breached a settlement agreement because "[a] contract dispute . . . does not give rise to a cause of action under Section 1983" (quoting *Costello*, 811 F.2d at 784)).

Mr. Jones's purported property interest is essentially "the interpretation of a contract term" and a contract dispute "does not give rise to a cause of action under section 1983." *Krukenkamp*, 395 F. App'x at 751. Therefore, Mr. Jones's due process claim fails, and the Court need not, and does not, address whether Mr. Jones was given the procedure he was due and whether Defendants are entitled to qualified immunity.[15]

Accordingly, Mr. Jones's motion for summary judgment on this count will be denied and Defendants' motion for summary judgment on this count will be granted.

### 5.  *Monell* Liability

The Town cannot be held liable under *Monell* because, as discussed at length above, the Court will grant Defendants' summary judgment on both of Mr. Jones's § 1983 claims. *See*

---

[15] Since the Court has found that Mr. Jones's equal protection claim fails on the merits, the Court will also not address Defendants' argument related to judicial estoppel.

*Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978) ("[W]hen execution of a government's policy or custom . . . inflicts the injury[,] . . . the government as an entity is responsible under § 1983.").

Accordingly, Mr. Jones's motion for summary judgment on this count will be denied and Defendants' motion for summary judgment on this count will be granted.

### B.  The Motion for Leave to Amend the Complaint

"Whether good cause [to amend] exists turns on the diligence of the moving party." *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal quotation marks and citations omitted). "A party is not considered to have acted diligently where the proposed amendment is based on information that the party knew, or should have known, in advance of the motion deadline." *Christians of Cal., Inc. v. Clive Christian N.Y., LLP*, No. 13-cv-0275 (KBF) (JCF), 2014 WL 3605526, at *4 (S.D.N.Y. July 18, 2014) (citing *Guity v. Uniondale Union Free Sch. Dist.*, No. 12-cv-1482, 2014 WL 795576, at *2 (E.D.N.Y. Feb. 27, 2014)). "The court may also consider prejudice to the nonmoving party, the length of delay in filing the amendment, and the explanation provided by the moving party." *Id.* (citing *Baez v. Delta Airlines, Inc.*, No. 12-cv-3672, 2013 WL 5272935, at *5 (S.D.N.Y. Sept. 18, 2013)).

"While mere delay, absent a showing of bad faith or undue prejudice, is not enough for a district court to deny leave to amend, the longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." *Park B. Smith, Inc. v. CHF Indus. Inc.*, 811 F. Supp. 2d 766, 779 (S.D.N.Y. 2011) (internal quotation marks and citations omitted). Courts "balance[] the length of the delay against the resulting prejudice . . . . [T]he longer the period of an unexplained delay, the less will be required of the nonmoving party

in terms of a showing of prejudice." *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 46–47 (2d Cir. 1983).

Mr. Jones has moved for leave to amend the Complaint to add four defendants, Chief Mello, the Chairman of POSTC; Chief Hayes, Connecticut Criminal Justice Information Services manager; POSTC; and Connecticut Department of Emergency Services and Public Protection, which oversees COLLECT. *See* Mot. to Amend Compl. at 1. Mr. Jones also moves for leave to amend the Complaint to add two additional claims—that the four additional defendants violated Mr. Jones's due process and equal protection rights. *See id.* Mr. Jones also seeks injunctive relief "in the form of an order directing [D]efendants to POSTC [and COLLECT] certify [Mr. Jones]." *Id.* at 2.

Defendants argue they will be unduly prejudiced by the proposed Amended Complaint because Mr. Jones's additions would "completely transform the suit" with new parties that are not additional Town employees and would require additional counsel, a new round of pleadings, motions, and discovery practice, likely including deposing witnesses that have already been deposed. *See* Opp'n to Mot. to Amend Compl. at 1, 8–9. Defendants also argue that Mr. Jones's Amended Complaint would be futile because most, if not all, of the claims therein are barred by the statute of limitations. *Id.* at 9–11.

Mr. Jones contends that there would be minimal further discovery and there was no undue delay because "the culpability of the new defendants was only recently obtained in discovery." Mot. to Amend Compl. at 10. More specifically, Mr. Jones argues that the new defendants' alleged liability was only identified when Mr. Jones obtained copies of the November 17, 2016 POSTC meeting. *Id.*

The Court disagrees.

"An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss [under] Fed. R. Civ. P. 12(b)(6)." *Lucente v. Int'l Bus. Machines Corp*., 310 F.3d 243, 258 (2d Cir. 2002). Accordingly, any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6).

Mr. Jones's proposed Amended Complaint includes many allegations that, like those in his original Complaint, are time-barred. As the Court held in its motion to dismiss ruling and order, Mr. Jones's constitutional claims are only viable if they occurred after March 30, 2018. *See* Mot. to Dismiss Order at 20–21. Mr. Jones's proposed Amended Complaint primarily includes new allegations that occurred before that date and therefore, they are time-barred. *See* Attach. 1 to Mot. to Amend Compl. at ¶¶ 138–162, ECF No. 43-2 ("Proposed Am. Compl.").

Mr. Jones includes one new allegation that is specifically within the March 30, 2018 statute of limitations date. He alleges that "[o]n May 10, 2018 POST Council determined at their meeting, under old business Sarnoski stated that Plaintiff[] 'can't be recertified because he can't make COLLECT requirement; he cannot be a police officer in the state of Connecticut without meeting those requirements.'" Proposed Am. Compl. ¶ 163.

This allegation alone, however, is insufficient to survive a motion to dismiss for the same reasons Mr. Jones's constitutional claims fail against the current Defendants, as discussed at length above. Specifically, Mr. Jones's proposed comparators were not subject to relevant differential treatment, *see Spinks*, 2011 WL 2491001, at *7 (W.D.N.Y. June 22, 2011) ("Selective treatment by a governmental entity implies some sort of conscious decision to take action against some people but not others against whom the same action could be taken."), and Mr. Jones cannot establish that he had a constitutionally protected property interest in his recertifications, *see Krukenkamp*, 395 F. App'x at 751 (summary order) (affirming district

court's grant of summary judgment where the plaintiff argued that his procedural due process rights were violated when the defendants breached a settlement agreement because "[a] contract dispute . . . does not give rise to a cause of action under Section 1983" (quoting *Costello*, 811 F.2d at 784)).

Accordingly, the Court will deny Mr. Jones's motion for leave to amend the Complaint.

### C.  The Motion for Leave to Amend Defendants' Answer

Defendants submitted a motion to amend their Answer to add an additional affirmative defense, judicial estoppel. *See* Mot. to Amend Answer. In support of this motion, Defendants attached a draft amended answer that includes a tenth affirmative defense that states "Plaintiff's claims are barred in whole or in part by the doctrine of judicial estoppel." *Id.* at 15. Defendants argue that "the interests of justice would be served by permitting the Defendants to amend their Answer to add the affirmative defense of judicial estoppel and enable them to argue that issue in their dispositive motion." *Id.* at 3.

In their motion for summary judgment briefing, Defendants only rely on the doctrine of judicial estoppel for Mr. Jones's equal protection and procedural due process claims. *See* Defs.' Mot for Summ. J. at 30–32; Defs.' Reply in Supp. of Mot. for Summ. J. at 7–8. As discussed above, the Court will grant summary judgment on both of Mr. Jones's constitutional claims and therefore, the Court will deny Defendants' motion to amend their answer as moot.

## IV.  CONCLUSION

For the foregoing reasons, Mr. Jones's motion for summary judgment is **DENIED.**

Defendants' motion for summary judgment is **GRANTED in part and DENIED in part.**

Defendants' motion for summary judgment is granted as to the equal protection, due

process, and *Monell* claims against all Defendants. Defendants' motion for summary judgment is denied as to the Title VII and CFEPA claims against the Town and the CFEPA aiding and abetting claims against Chief Sansom and Deputy Chief Hawkins.

Mr. Jones's motion to amend the Complaint is **DENIED.**

Defendants' motion for leave to amend their answer is **DENIED as moot.**

SO ORDERED at Bridgeport, Connecticut, this 27th day of January, 2023.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE